```
                IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF HAWAI`I
_____
                              )
BEVERLY K. BENNETT,           )
                              )
              Plaintiff,      )
                              )
       v.                     )  Civ. No. 18-00171 ACK-KJM
                              )
POIPU RESORT PARTNERS, L.P., a )
Domestic Limited Partnership; )
DIAMOND RESORTS INTERNATIONAL )
CLUB, INC., a Foreign Profit  )
Corporation; ASSOCIATION OF   )
APARTMENT OWNERS OF POIPU     )
POINT, a Domestic Nonprofit   )
Corporation,                  )
                              )
              Defendants.     )
_____)
                              )
POIPU RESORT PARTNERS, L.P., a )
Domestic Limited Partnership; )
DIAMOND RESORTS INTERNATIONAL )
CLUB, INC., a Foreign Profit  )
Corporation; ASSOCIATION OF   )
APARTMENT OWNERS OF POIPU     )
POINT, a Domestic Nonprofit   )
Corporation,                  )
                              )
              Third-Party     )
              Plaintiffs,     )
                              )
       v.                     )
                              )
EMSER TILE, LLC, a California )
Corporation; JOHN DOES 1-10;  )
JANE DOES 1-10; ROE           )
CORPORATIONS 1-10; ROE        )
PARTNERSHPS 1-10; ROE         )
BUSINESS ENTITIES 1-10,       )
                              )
              Third-Party     )
              Defendants.     )
_____)
```

1

## ORDER GRANTING IN PART AND DENYING IN PART THIRD-PARTY DEFENDANT AND COUNTERCLAIMANT EMSER TILE, LLC'S MOTION FOR PARTIAL SUMMARY JUDGMENT (ECF No. 95)

Plaintiff Beverly Bennett brought this lawsuit to recover damages stemming from her fractured femur after she slipped and fell on wet tile while walking back to her vacation condominium at the Point at Poipu.  Bennett sued the owners of the Point at Poipu-Poipu Resort Partners, L.P., Diamond Resorts International Club, Inc., and the Association of Apartment Owners of Poipu Point (collectively, the "Owners")-for negligence.  In turn, the Owners filed a Third-Party Complaint against the company that manufactured the tiles, Emser Tile, LLC.  Emser now moves for partial summary judgment on the breach of warranty, failure to warn, and negligent misrepresentation claims against it, ECF No. 95.

For the reasons discussed below, the Court GRANTS IN PART AND DENIES IN PART Emser's Motion for Partial Summary Judgment, ECF No. 95.

## BACKGROUND

### I.   Factual Background

The following facts are principally drawn from the Complaint, ECF No. 1, the First Amended Third-Party Complaint

("FAC"), ECF No. 69, Emser's concise statement of facts ("CSF"), ECF No. 96, and the Owners' CSF, ECF No. 162.

### a. The Point at Poipu Renovation

In 2012, the Owners of The Point at Poipu, a time-share resort in Kauai, undertook an estimated five-year renovation of the property. See Mot. at 1. The renovation included installation of ceramic tiles on the walking surfaces at the ten resort buildings. Id. The Owners hired Building Envelope Technology & Research, Inc. ("the architect") as the architect, Layton Construction Company ("Layton") as the general contractor, and Global Stone, Inc. ("Global Stone") as the tile subcontractor. Id. Layton in turn contracted with Emser to supply the tiles. Id. at 5.

When the Owners were choosing between two types of tiles for the renovation, Emser sent its product information, known as a "cut sheet" to Layton on September 10, 2012. See Emser Ex. C; Johnson Decl. ¶ 14. Among this information were specifications for the Bombay tile line, stating that the coefficient of friction of the Bombay tiles based on the ASTM C1028 test was equal to or greater than 0.60 wet. See Emser Ex. C. In layman's terms, the coefficient of friction is "the degree of slip resistance." Mihailovich v. Laatsch, 359 F.3d 892, 896, n.2 (7th Cir. 2004); see also Shorter Oxford English Dictionary 1035 (5th ed. 2002) (defining the coefficient of

3

friction as "the ratio between the force necessary to move one surface horizontally over another and the normal force each surface exerts on the other"). "The higher the [coefficient of friction], the less slippery the [surface] w[ill] be." Mihailovich, 359 F.3d at 921 n.2. At the hearing, Emser's counsel admitted that Emser is unable to identify which precise laboratory generated the 0.6 coefficient of friction both wet and dry supplied on the cut sheet.

Other than providing information requested by the contractors, Owners, and the architect, Emser was not involved in the selection of the tile installed during the project. Johnson Decl. ¶ 18. The Emser employee responsible for corresponding with the Owners, Linda Hart, was aware that one of the Owners (Diamond Resorts) "always wanted to make sure that [the tile] hit at least a .60 [wet coefficient of friction]." Def. Ex K (Deposition of Linda Hart) at 17:3-23. Based on that requirement as well as price and color preferences, Linda Hart recommended three tile options to the Owners. Id. at 14:10-14. After reviewing Emser's cut sheet and product specifications, the Owners selected the Bombay tiles in the Salsette color. Johnson Decl. ¶¶ 16, 19. Emser sent the first shipment of tiles to be used at Building 4 within 48 hours of September 28, 2012. Id. ¶¶ 29, 30.

On October 5, 2012, Global Stone requested assistance from Emser in providing information to the design consultant. Id. ¶ 27.  In response to Global Stone's request, Emser prepared a "Bombay Master Certificate" that contained information about the Bombay tiles, including their technical specifications. Makovski Decl. ¶¶ 14-17.

To prepare the Bombay Master Certificate, Emser reviewed the results of testing performed by the Title Council of North America laboratory (the "TCNA laboratory") that occurred in June of 2011.  Id. ¶ 20; Emser Ex. 2.  The TCNA laboratory report stated that the coefficient of friction based on the ASTM C1028 test was an average of 0.58 wet.  Makovski Decl. ¶ 13.  Based on this information, Emser listed the coefficient of friction as greater than 0.55 wet.  Id. ¶ 17; see Emser Ex. 3.  Emser submitted the Bombay Master Certificate to Global Stone and Layton on October 11, 2012.  Johnson Decl. ¶ 38; see Emser Ex. K; Emser Ex. L.

Two weeks later, the architect asked Emser to revise and resubmit the Bombay Master Certificate to confirm that Emser approved the submitted mortar and grout for use and installation of the Bombay tiles as required for a 10-year system warranty. Johnson Decl. ¶ 42; see Emser Ex. N, Emser Ex. O.

In response, Emser provided a Revised Bombay Master Certificate, which repeated that the coefficient of friction of

the Bombay tiles was greater than or equal to 0.55 wet.  Johnson Decl. ¶ 47; Makovski Decl. ¶ 20; see Emser Ex. 4.  The architect stamped the certificate with the words "Corrections or comments made on this submittal do not constitute approval or acceptance of unauthorized deviation from contract documents.  Such deviations must be requested in writing in accordance with the requirements of the Contract Documents."  See Def. Ex. F.

Layton handled the sale of tiles for each building as separate contracts.  Johnson Decl. ¶ 9; see Emser Ex. A.  Layton therefore required Emser to submit a separate unconditional lien waiver as a materials supplier for each building.  Johnson Decl. ¶ 11.  As required by Layton, in September 2014 Emser submitted the unconditional lien waiver to Layton as a materials supplier for the tiles that it sold for installation at Buildings 5 and 7.  Id. ¶ 59; see Emser Ex. V.  Emser shipped the tile for Buildings 5 and 7 on or about September 26, 2014.  Johnson Decl. ¶ 54.

Emser's invoices stated that each sale was subject to the Terms and Conditions of Sale ("Terms and Conditions") found on Emser's website.  Johnson Decl. ¶ 56; see Emser Ex. T.  On its website, Emser provided a one-year warranty for manufacturing defects and limited the warranty to the direct purchaser.  See Emser Ex. U.  Emser disclaimed all other warranties, express or implied, including warranties of

6

merchantability and fitness for a particular purpose or use.
Id.

### b. Bennett's Injury at the Point at Poipu

While vacationing at The Point at Poipu in October of 2017, Bennett slipped and fell on the ceramic tiles on the walkways outside of Building 5.  Compl. ¶ 16.  As a result of the fall, Bennett fractured her right femur and claims she suffered "other bodily injuries, mental anguish, and emotional distress."  Id. ¶ 17.  She alleges that the Owners knew or should have known that the tiled walkways would become slippery when wet.  Id. ¶ 12.  In her Complaint, Bennett claims negligence, breach of warranty, and nuisance, and requests punitive damages.  See id. ¶¶ 20, 21, 27.

Emser is involved in this litigation as a Third-Party Defendant.  The First Amended Third-Party Complaint against Emser alleges:  (1) contribution, subrogation, and indemnity, (2) breach of express and implied warranties, (3) failure to warn, (4) negligent misrepresentation, and (5) strict product liability.

Three lawsuits have been filed as a result of injuries allegedly sustained in slip and fall accidents at Buildings 5 and 7, and one has been filed in connection with tiles installed at Building 8.  Mot. at 7.  On July 18, 2016, La Sonya Allen fell at Building 7.  Id.  Fifteen months later on October 4,

2017, Bennett fell at Building 5.  Id.  On June 13, 2018, Elrose
Caruso fell at Building 7.  Id.  On August 13, 2018, the
accident at Building 8 occurred.  Id.

As a part of this litigation, the Owners' expert
engineer Bernard Maddox tested the leftover boxed Bombay
Salsette tiles from the Poipu project.  Def. CSF ¶ 27.  Using
the ASTM C 1028 protocol, the results of the 2020 test revealed
an average wet coefficient of friction of 0.48.  Id.  The
results of the 2021 test found an average wet coefficient of
friction under 0.49.  Id.

## II.  Procedural Posture

Bennett originally brought this lawsuit on May 14,
2018.  See ECF No. 1.  On September 20, 2019, Magistrate Judge
Mansfield issued an order granting the Owners leave to file a
third-party complaint, ECF No. 29, and one week later the Owners
filed a Third-Party Complaint against Emser, ECF No. 30.  The
parties then entered into mediation a month later.  On November
20, 2020, Emser filed a motion for leave to file an amended
answer to assert counterclaim.  ECF No. 56.  All parties
stipulated to allow the Owners to amend their Third-Party
Complaint and Emser to amend its answer.  ECF No. 68.  As a
result, the Owners filed the First Amended Third-Party Complaint
against Emser, Jane Does 1-10, John Does 1-10, Roe Business
Entities 1-10, and Roe Corporations 1-10.  ECF No. 69.

On April 8, 2021, Emser filed the present Motion for Partial Summary Judgment, ECF No. 95, and a CSF in support, ECF No. 96.  The Owners filed their Opposition, ECF No. 161, and their CSF in support, ECF No. 162.  Bennett filed a Statement of No Position, ECF No. 160.  Emser then filed its Reply, ECF No. 165.  A hearing on the Motion was held on August 24, 2021.

## **STANDARD**

Summary judgment is proper where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Rule 56(a) mandates summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986); see also Broussard v. Univ. of Cal., 192 F.3d 1252, 1258 (9th Cir. 1999).

"A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact."  Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007) (citing Celotex, 477 U.S. at 323, 106 S. Ct. at 2553); see also Jespersen v. Harrah's Operating Co.,

392 F.3d 1076, 1079 (9th Cir. 2004).  "When the moving party has carried its burden under Rule 56[(a)] its opponent must do more than simply show that there is some metaphysical doubt as to the material facts [and] come forward with specific facts showing that there is a genuine issue for trial."  Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 586-87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (citation and internal quotation marks omitted and emphasis removed); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) (stating that a party cannot "rest upon the mere allegations or denials of his pleading" in opposing summary judgment).

        "An issue is 'genuine' only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party, and a dispute is 'material' only if it could affect the outcome of the suit under the governing law." In re Barboza, 545 F.3d 702, 707 (9th Cir. 2008) (citing Anderson, 477 U.S. at 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202). When considering the evidence on a motion for summary judgment, the court must draw all reasonable inferences on behalf of the nonmoving party.  Matsushita Elec. Indus. Co., 475 U.S. at 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538; see also Posey v. Lake Pend Oreille Sch. Dist. No. 84, 546 F.3d 1121, 1126 (9th Cir. 2008) (stating that "the evidence of [the nonmovant] is to be

10

believed, and all justifiable inferences are to be drawn in his favor" (internal citation and quotation omitted)).

## DISCUSSION

As discussed above, the Court must decide whether to grant Emser partial summary judgment on three claims:  (1) breach of express and implied warranties, (2) failure to warn, and (3) negligent misrepresentation.  After deciding initially that California law applies to the warranty contract claims and that Hawaii law applies to the failure to warn and negligent misrepresentation tort claims, the Court GRANTS the Motion as to the express and implied warranty claims, DENIES the Motion as to the failure to warn claim, and GRANTS the Motion only to the extent that the Owners assert a claim under negligent misrepresentation for the value of the tile.

## I.  Choice of Law

As an initial matter, the Court addresses the parties' arguments regarding choice of law.  Emser argues for application of California law given the choice of law provision found in its Terms and Conditions.  Mot. at 13 n.2.  Emser's Terms and Conditions state:

> Emser and Buyer agree that this agreement shall be deemed made in Los Angeles, California; that the internal laws of California shall govern; and that the state or federal courts sitting in Los Angeles County, California shall

11

> have jurisdiction and are the proper venue for all
> actions hereunder.

Emser Ex. U (emphasis added).  The Owners, on the other hand,
argue for the application of Hawaii law because it asserts there
is a fundamental policy difference as to whether a seller can
disclaim an implied warranty.  Opp. at 17-20 (citing Paige v.
Pulse Bev. Corp., No. 16-00090 ACK-RLP, 2017 WL 11139681, at *9
(D. Haw. Nov. 9, 2017), and other cases).

A federal court sitting in diversity applies the
choice-of-law rules of the forum state.  Nguyen v. Barnes &
Noble, Inc., 763 F.3d 1171, 1175 (9th Cir. 2014).  This Court
must therefore analyze which law applies under Hawaii choice-of-
law rules.

The Hawaii Supreme Court has stated that "[w]hen the
parties choose the law of a particular state to govern their
contractual relationship and the chosen law has some nexus with
the parties or the contract, that law will generally be
applied."  Airgo, Inc. v. Horizon Cargo Transport, Inc., 66 Haw.
590, 595, 670 P.2d 1277, 1281 (Haw. 1983) (citing Restatement
(Second) of Conflict of Laws § 187(1) (1971)).  Where the
parties' contract includes a choice of law provision, the Hawaii
Supreme Court is typically "guided by" the Restatement (Second)
of Conflict of Laws.  See Del Monte Fresh Produce (Hawaii), Inc.
v. Fireman's Fund Ins. Co., 183 P.3d 734, 741 (Haw. 2007)

12

(citing <u>Airgo</u>, 670 P.2d at 1281); <u>Willcox v. Lloyds TSB Bank, PLC</u>, Civ. No. 13-00508 ACK-RLP, 2014 WL 12780002, at *7 (D. Haw. June 10, 2014); <u>Standard Register Co. v. Keala</u>, No. Civ. 14-00291 JMS-RL, 2015 WL 3604265, at *6 (D. Haw. June 8, 2015). Section 187 of the Restatement provides, in relevant part:

> . . .

> (1)   The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either

> . . .

>> (a)   application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

Restatement (Second) of Conflict of Laws § 187(1)-(2) (1971).

The Court finds that California law on the issues before the Court is not contrary to a fundamental policy of Hawaii because a seller is able to disclaim an implied warranty of fitness for a particular purpose in either state.  Under both California and Hawaii statutes, a seller is able "to exclude or modify any implied warranty of fitness" as long as the exclusion is "a writing" and "conspicuous."  Cal. Com. Code § 10214; Haw.

Rev. Stat. § 490:2-316.  Further, under Hawaii Revised Statute § 490:2-318:

> A seller's warranty whether express or implied extends to any person who may reasonably be expected to use, consume or be affected by the goods and who is injured by breach of the warranty.  A seller may not exclude or limit the operation of this section with respect to injury to the person of an individual to whom the warranty extends.

Haw. Rev. Stat. § 490:2-318 (2019).  The Uniform Commercial Code Comments to Hawaii Revised Statute § 490:2-318 explain that "[t]he last sentence of this section does not mean that a seller is precluded from excluding or disclaiming a warranty which might otherwise arise in connection with the sale provided such exclusion or modification is permitted by Section 2-316."  Haw. Rev. Stat. § 490:2-318 (2019), Uniform Commercial Code Comment 1.  Section 2-316 states, in part:

> [T]o exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous.  Language to exclude all implied warranties of fitness is sufficient if it states, for example, that "There are no warranties which extend beyond the description on the face hereof."

Haw. Rev. Stat. § 490:2-316.  Because California and Hawaii law thus permit a disclaimer of the implied warranty of fitness for a particular purpose, California law is not contrary to a fundamental policy of Hawaii.

14

Therefore, under Hawaii law, "a choice of law provision provided for in a contract between the parties will generally be upheld."  Smallwood v. NCsoft Corp., 730 F. Supp. 2d 1213, 1225 (D. Haw. 2010) (citation omitted).  Because California law on this issue is not contrary to a fundamental policy of Hawaii, the Court will honor the choice of law provision with regard to the breach of warranty claims.

Contrary to Emser's argument that the choice-of-law clause is dispositive and must apply to all claims, the clause's significance is tempered because two of the three causes of action here-failure to warn and negligent misrepresentation-are torts, and "[c]laims arising in tort are not ordinarily controlled by a contractual choice of law provision."  Sutter Home Winery, Inc. v. Vintage Selections, Ltd., 971 F.2d 401, 407 (9th Cir. 1992); but see Puna Geothermal Venture v. Allianz Global Risks U.S. Ins. Co., Civ No. 19-00451 SOM-WRP, 2019 WL 6619851, at *4 (D. Haw. Dec. 5, 2019) (interpreting a choice-of-law provision found in an insurance contract to apply to all claims arising out of the parties' contractual relationship).  "Rather, [non-contract claims] are decided according to the law of the forum state."  Sutter Home Winery, Inc., 971 F.2d at 407.

The Court must therefore apply Hawaii's general choice-of-law test to determine which tort law applies-without "the strong presumption that arises from a contractual choice

15

for contract-based claims." Jou v. Adalian, Civ No. 15-00155 JMS-KJM, 2018 WL 1955415 (D. Haw. April 25, 2018); see, e.g., Hawaii Island Air, Inc. v. Merlot Aero Ltd., Civ No. 14-00466 BMK, 2015 WL 675512, at *19 (D. Haw. Jan. 30, 2015) ("This district has recognized that a choice-of law provision governs the interpretation of a contract and rights arising therefrom, but not necessarily the related, non-contractual claims.") (citing Prop. Rights. Law Group, P.C. v. Lynch, Civ No. 13-00273 SOM-RLP, 2014 WL 2452803, at *13 (D. Haw. May 30, 2014)). That is, for non-contractual claims, Hawaii's choice-of-law rules require a determination of which state has "the most significant relationship to the parties and the subject matter." Mikelson v. United Servs. Auto Ass'n, 107 Haw. 192, 198, 111 P.3d 601, 607 (2005) (internal citation and quotation omitted); see, e.g., Hamby v. Ohio Nat. Life Assur. Corp., Civ No. 12-00122 JMS-KSC, 2012 WL 2568149, at *3 (D. Haw. June 29, 2012) (applying Mikelson to suit alleging breach of contract, bad faith, and statutory violations); Jou, 2018 WL 1955415, at *6 (applying Mikelson to suit alleging intentional spoliation of evidence); St. James v. JP Morgan Chase Bank Corp., Civ No. 16-00529 LEK-KSC, 2017 WL 4392040, at *5 (D. Haw. Sept. 29, 2017) (applying Mikelson to tort claims).

        "In making this determination, courts 'look to factors such as (1) where relevant events occurred, (2) the residence of

the parties, and (3) whether any of the parties had any particular ties to one jurisdiction or the other.'" Hamby, 2012 WL 2568149, at *3 (quoting Kukui Gardens Corp. v. Holco Cap. Grp., Civ No. 08-00049 ACK-KSC, 2010 WL 145284, at *5 (D. Haw. Jan. 12, 2010)).

Applying Mikelson, the Court concludes that Hawaii law applies to the failure to warn and negligent misrepresentation claims currently before the Court.  Bennett was injured at the Point at Poipu in Hawaii, the purchase of the tiles from Emser was for use at the Point at Poipu in Hawaii, the tile installation was performed in Hawaii, the architect for the renovation was licensed in Hawaii, the building code that applies is that of the County of Kauai, and Emser shipped the tiles to Kauai.  Def. CSF ¶¶ 15-20.  The final decision to approve the tiles was made by the Owners in Kauai.  Id. ¶ 18.  Bennett ultimately chose to bring this action in this jurisdiction and has named witnesses located in Hawaii.  Id. ¶ 15.  These factors all indicate that Hawaii has the strongest interest in resolving the failure to warn and negligent misrepresentation tort claims.

It is a well-settled principle of conflict-of-law analysis that different jurisdiction's laws can apply to different issues in the same case.  Jou, 2018 WL 1955415, at *6; see, e.g., Allstate Ins. Co. v. Hague, 449 U.S. 302, 307, 101 S.

17

Ct. 633, 637, 66 L. Ed. 2d 521 (1981) (recognizing a principle
"long accepted by this Court, that a set of facts giving rise to
a lawsuit, or a particular issue within a lawsuit, may justify,
in constitutional terms, application of the law of more than one
jurisdiction") (citations omitted); Berg Chilling Sys., Inc. v.
Hull Corp., 435 F.3d 455, 462 (3d Cir. 2006) ("Because choice of
law analysis is issue-specific, different states' laws may apply
to different issues in a single case, a principle known as
'depecage.'") (citation omitted); DeRoburt v. Gannett Co., 83
F.R.D. 574, 581 n.29 (D. Haw. 1979) ("Traditional choice of law
rules have also been used to apply different rules of law to
different issues arising in the same case.").

In short, the Court applies California substantive law
to the Owners' breach of warranty contract claims and Hawaii
substantive law to the Owners' failure to warn and negligent
misrepresentation tort claims.  Having decided the choice of law
issue, the Court addresses the merits of Emser's Motion for
Partial Summary Judgment.

## II.  Breach of Express and Implied Warranties (Count II)

Emser has moved for partial summary judgment on the
Owners' claims of breach of express warranty and breach of the
implied warranty of fitness for a particular purpose.  Mot. at
17-19.  As discussed supra, the contractual claim of breach of
warranty will be governed by the choice of law provision

specifying the application of California law.  The Court

addresses each claim below.[1]

### a. Express Warranty

After first addressing the impact of the disclaimer

found in Emser's Terms and Conditions, the Court ultimately

GRANTS the Motion on the express warranty claim.

### i. The Effect of Emser's Disclaimer

In its Motion, Emser argues that it disclaimed all

express warranties other than the manufactured products warranty

specifically discussed within its Terms and Conditions.[2]  To the

---

[1] As an initial matter, the Court finds that the Owners are intended third-party beneficiaries.  In general, privity of contract is required in an action for breach of express warranty and breach of implied warranty.  Burr v. Sherwin Williams Co., 42 Cal.2d 682, 695 P.2d 1041 (1954); Tapia v. Davol, Inc., 116 F. Supp. 3d 1149, 1159 (S.D. Cal. 2015).  It is undisputed that Emser entered into a contract with Layton, and thus no privity existed between Emser and any of the Owners.

But under California Civil Code § 1559, a third-party beneficiary can enforce a contract made expressly for his benefit.  Cal. Civ. Code § 1559; see Shell v. Schmidt, 126 Cal. App. 2d 279, 272 P.2d 82 (1954) (finding that the plaintiffs purchasing homes constituted the class intended to be benefitted and holding that the contract must therefore be for their benefit).  A contract made expressly for a third party's benefit does not need to specifically name the party as the beneficiary; rather the only requirement is that "the party is more than incidentally benefitted by the contract."  See id.; see also Gilbert Fin. Corp., Steelform Contracting Co., 82 Cal. App. 3d 65, 69-70, 145 Cal. Rptr. 448, 450 (Ct. App. 1978) (holding that the plaintiff, as the owner of the building, was an intended beneficiary of the contract between the general contractor and the subcontractor).

Because Poipu was the ultimate customer who chose the Bombay tiles, and whom Emser was aware it was providing the tiles for, the Court finds that the Owners are intended third-party beneficiaries of the contract for the Bombay tiles between Layton and Emser.

[2] The Manufactured Products warranty in Emser's Terms and Conditions reads:

> Emser warrants that manufactured products will be free from defect for a period of one year from date of purchase.  Defect is defined as a shortfall in the product to perform to specifications as disclosed in product or trade literature, within industry allowable tolerances as set forth in standard, national industry protocols.

extent that Emser contends that this language overrides any of its other statements made to the Owners, Emser is incorrect.

California law on limiting warranties provides that "[w]ords or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; but . . . negation or limitation is inoperative to the extent that such construction is unreasonable." Cal. Com. Code § 2316(1). Because a disclaimer "is inconsistent with" an express warranty, "words of disclaimer . . . give way to words of warranty unless some clear agreement between the parties dictates the contrary relationship." In re Nexus 6P Prod. Liab. Litig., 293 F. Supp. 3d 888, 941 (N.D. Cal. 2018) (internal citation and quotation omitted); see also Arroyo v. TP-Link USA Corp., No. 14-CV-04999-EJD, 2015 WL 5698752, at *10 (N.D. Cal. Sept. 29, 2015); Hauter v. Zogarts, 14 Cal. 3d 104,

---

This one-year express warranty is the sole warranty extended and replaces any statutory warranties to the maximum extent allowable by law.  Customer misuse including negligence, physical, or chemical abuse is not covered by the warranty.  Installation defects or installations that violate building codes are not covered by this warranty.  All warranty claims must be reported immediately. Failure to report any warranty claim within 30 days of defect discovery will void this warranty.  All products must be inspected prior to installation.  Visual defects or nonconformities apparent prior to installation voids this warranty.  Manufactured tile is subject to variation due to an inherent variability in raw materials and production processes.  Ceramic tile with a rating of V3 or V4 may contain higher levels of variation.  All products should be inspected prior to installation.

Emser Ex. U.

120 Cal. Rptr. 681, 534 P.2d 377, 386 (1975) (explaining that Cal. Com. Code § 2316 "seeks to protect a buyer from unexpected and unbargained language of disclaimer by denying effect to such language when inconsistent with language of express warranty," and that amendments to § 2316 have not altered the "spirit" of the law as originally drafted:  "If the agreement creates an express warranty, [w]ords disclaiming it are inoperative.").

Insofar as Emser argues its disclaimer precludes liability for breach of express warranty "that the subject flooring tile could be safely used for its intended purposes," FAC ¶ 12, Emser's argument fails.  The Court therefore finds that Emser's general disclaimer found in its Terms and Conditions does not apply to the express warranty claim.

### ii. Breach of Express Warranty

To state a claim for breach of express warranty under California law, "a plaintiff must allege (1) the exact terms of the warranty; (2) reasonable reliance thereon; and (3) a breach of warranty, which proximately caused plaintiff's injury."  T&M Solar & Air Conditioning, Inc. v. Lennox Intl'l Inc., 83 F. Supp. 3d 855, 875 (N.D. Cal. 2015).  "Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description."  Cal. Com. Code. § 2313(1)(b).  "Statements made by a manufacturer through its advertising efforts can be

construed as warranty statements." Aaronson v. Vital Pharms., Inc., No. 09-CV-1333 W (CAB), 2010 WL 625337, at *6 (S.D. Cal. Feb. 17, 2010).

Clearly, the Owners have failed to submit evidence of a breach of Emser's express warranty within the required time of one year, or that the Owners filed a timely claim. Accordingly, the Court only briefly discusses the other arguments Emser makes regarding the Owners' assertion there was a breach of Emser's express warranty. In the Owners' First Amended Third-Party Complaint, the Owners allege in a conclusory manner that Emser "warranted and/or represented that the subject flooring tile could be safely used for its intended purposes." FAC ¶ 12. "To allege facts identifying the exact terms of the warranty, a plaintiff must provide 'specifics' about what the warranty statement was, and how and when it was breached." T&M Solar and Air Conditioning, 83 F. Supp. 3d at 875. Yet the Owners' allegation falls short of any clear representation, rising to a warranty. See MacNeil Auto. Prod., Ltd. v. Cannon Auto. Ltd., 715 F. Supp. 2d 786, 795 (N.D. Ill. 2010) (finding that alleged representations that floor mats would be "quality mat[s]," "would meet . . . expectations of quality," and "would be suitable for their purposes" are not warranties).

Drawing all reasonable inferences in the Owners' favor, they have failed to carry their burden on summary judgment by

presenting evidence that Emser made any express warranty that the subject flooring tile could be safely used for its intended purposes.  The Owners contend in their Opposition that "there were representations made about the slip resistance of the tiles, [and] there is a genuine dispute about what those representations were . . . ."  Opp. at 19.  To overcome this partial summary judgment motion, the Owners were obligated to provide a greater factual basis for any alleged express warranty.  The Owners have not identified the person who made the alleged express warranty, nor the specific words of the express warranty, nor how the alleged warranty became part of the basis of the bargain.

For the foregoing reasons, the Court GRANTS Emser's Motion for Partial Summary Judgment as to the express warranty claim.

### b. Implied Warranty:  Fitness for a Particular Purpose

The Court next addresses the Owners' claim for an implied warranty of fitness for a particular purpose.  Emser moves for partial summary judgment on this claim for several reasons, but the Court need only reach the first:  that the Owners' claims are barred by a disclaimer of the implied warranty of fitness for a particular purpose in the Terms and Conditions.

Unlike with an express warranty, the implied warranty of fitness for a particular purpose generally may be disclaimed. See Cal. Com. Code § 2316(2).  The Owners do not dispute that they are bound by the Terms and Conditions, they instead contend that the disclaimer is not conspicuous.  In order to successfully disclaim a warranty, the disclaimer must be conspicuous.  See Cooper v. Simpson Strong-Tie Co., Inc., 460 F. Supp. 3d 894, 913 (N.D. Cal. 2020).  California law defines "conspicuous" as covering "[a] heading . . . in contrasting type, font, or color to the surrounding text of the same or lesser size" and "[l]anguage in the body of a record or display . . . in contrasting type, font, or color to the surrounding text of the same size, or set off from surrounding text of the same size by symbols or other marks that call attention to the language."  See Cal. Com. Code § 1201(10).

Under the heading "Warranty," Emser's Terms and Conditions provide in clear language and bold and capitalized formatting that Emser "disclaims any and all other warranties, express or implied, including but not limited to, warranties of merchantability or fitness for a particular purpose or use." Emser Ex. U.  This disclaimer is in all capital letters while the surrounding text is in lower case font of the same size. See id.  California courts have found very similar disclaimers to have barred implied warranty claims.  See e.g., Minkler v.

24

Apple, Inc., 65 F. Supp. 3d 810, 819 (N.D. Cal. 2014) (barring an implied warranty claim based on Apple's disclaimer of "ALL STATUTORY AND IMPLIED WARRANTIES, INCLUDING WITHOUT LIMITATION, WARRANTIES OF MERCHANTABILITY"); In re Google Phone Litig., No. 10-CV-01177-EJD, 2012 WL 3155571, at *8 (N.D. Cal. Aug. 2, 2012) (barring an implied warranty claim based on Google's disclaimer of "ALL WARRANTIES AND CONDITIONS OF ANY KIND, WHETHER EXPRESS OR IMPLIED, REGARDING ANY DEVICES, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY").  In these circumstances, the Court concludes that Emser's disclaimer is conspicuous.

The Owners argue that the language on the invoices themselves states only, "To view our full product offering, our branch locations, and our Terms and Conditions of Sale or to view or receive electronic copies of your invoices, please visit www.emser.com."  Opp. at 22.  Therefore, in the Owners' view, this multistep process to reach the text of the disclaimer is not "obvious."  Id.  But the case the Owners erroneously rely on, Wilson v. Huuuge, Inc., 944 F.3d 1212, 1214 (9th Cir. 2019), is readily distinguishable.

In Wilson, the court found that the gaming phone application did "did not notify users that the app had terms and conditions, let alone put them in a place the user would necessarily see."  Id. at 1220.  Here, of course, Emser directs readers to its website, which displays its Terms and Conditions

25

conspicuously.  The Owners do not otherwise allege that they did not see or understand the disclaimer.  Thus, this case is unlike <u>Wilson</u> where the allegations established that the plaintiff did not have a reasonable opportunity to view the disclaimer prior to purchase.  <u>Id.</u>

The Court will therefore enforce Emser's disclaimer found in its Terms and Conditions and GRANTS Emser's Motion for Partial Summary Judgment on the implied warranty claim.

**III.  Failure to Warn as to Third-Party Defendant (Count III)**

The Court next turns to the Owners' failure to warn claim.  The Owners allege that Emser "placed the subject flooring tile into the stream of commerce and/or sold it in a defective and unreasonably dangerous condition, and which posed an unreasonable risk of harm.  Notwithstanding such knowledge, [Emser] failed to adequately warn users of the subject flooring tile about its slipperiness, especially when wet, and the risks associated with its use."  FAC ¶ 16.  In response, Emser argues that the Owners' failure to warn claim fails because Emser's warning is adequate as a matter of law.  The Court disagrees.

Hawaii courts have explained that the duty to warn against unusual hazards has long been recognized as a source of tort liability.  <u>See</u> <u>Kajiya v. Dep't of Water Supply</u>, 2 Haw. App. 221, 225, 629 P.2d 635, 639 (Haw. Ct. App. 1981).  When a person who is in control of "what he knows or should know is a

26

dangerous agency, which creates a foreseeable peril to persons or property that is not readily apparent to those endangered, to the extent that it is reasonably possible," that person owes a duty to warn them of the potential danger.  Id. at 640.

In this jurisdiction, a manufacturer must provide adequate instructions for safe use of the product and warnings as to the dangers inherent in improper use of the product. Acoba v. General Tire, Inc., 92 Haw. 1, 15, 986 P.2d 288, 302 (Haw. 1999).  A manufacturer has a duty to "give appropriate warning of any known dangers which the user of its product would not ordinarily discover."  Id. at 305 (citation omitted).  So "[w]hen a product warning has been provided by a manufacturer, the adequacy of that warning is generally a question of fact for the jury."  Acoba, 986 P.2d at 302 (collecting cases).

In the Owners' Opposition, they allege a post-sale duty to warn on the part of the manufacturer after the manufacturer discovers a defect.  Opp. at 15.  Hawaii courts have recognized such a duty.  See Tabieros v. Clark Equip. Co., 85 Haw. 336, 355-56, 944 P.2d 1279, 1298-99 (1997) ("If, however, the manufacturer is not aware of the defect until after manufacture or sale, it has a duty to warn upon learning of the defect; if there exists a point-of-manufacture duty to warn, a postmanufacture duty to warn necessarily continues upon learning of the defect.").

27

"In rare instances, however, warnings may be found adequate as a matter of law." Acoba, 986 P.2d at 302.  For example, a warning may be deemed adequate as a matter of law where it is "very clear, understandable and completely unambiguous" and "forcefully [brings] home the intended message." Temple v. Velcro USA, Inc., 148 Cal. App. 3d 1090, 1095, 196 Cal. Rptr. 531, 533 (Ct. App. 1983); see also Bryant v. Tech. Research Co., 654 F.2d 1337, 1345-46 (9th Cir. 1981) ("An important factor in evaluating the adequacy of a warning is the clarity of the warning."); see e.g., Acoba at 303 ("[Defendant's] manual thus clearly and explicitly warned [plaintiff] of the risk that '[a] build-up of rust and/or corrosion can prevent the side/lock rings from properly seating [and may] cause an explosive separation during inflation.'").

Here, the Owners allege that Emser "failed to adequately warn users of the subject flooring tile about its slipperiness, especially when wet, and the risks associated with its use."  FAC ¶ 16.

Emser argues that it warned about precisely the risk that the Owners are alleging, that is, that the tiles may be slippery when wet and to take care when selecting the material when it will be exposed to liquids.  Mot. at 18.  Indeed, the cut sheet Emser provided states:  "Ceramic tile floors, like other types of glazed floors, can become slippery when wet.

Take extra care when selecting a floor product that will be exposed to conditions such as liquids, grease, or oil." Emser Ex. C.  But the cut sheet that contains the warning also confusingly states the Bombay tile coefficient of friction as greater than or equal to 0.6 both dry and wet.  At the hearing, Emser's counsel could not explain any reason for such a statement.  It is questionable what impact such confusion had on the Owners.

Emser also knew that the 0.6 coefficient of friction (or whatever the actual coefficient of friction might be) was determined by testing the average of three tiles, so some tiles would have a higher coefficient of friction and some would have lower.  See Emser Ex. 2.  Accordingly, Emser knew that some of the tiles installed at Poipu would be below a 0.6 coefficient of friction when wet; on the other hand, there's no evidence that Poipu was so aware.  Emser's counsel also asserted that the architect should have known that the 0.6 coefficient of friction would have been determined as an average.  Yet Emser knew that the Owners wanted a 0.6 coefficient of friction as testified by Linda Hart.  See Def. Ex K (Deposition of Linda Hart) at 17:6-7.

There is an additional dispute here as to whether Emser's issuance of the Bombay Master Certificate as well as the Revised Bombay Master Certificate both bearing a 0.55 coefficient of friction constitutes a sufficient warning.  The

29

Owners' architect reviewed both documents and requested and received two changes.

Moreover, notwithstanding Emser's representation as to the subject tile's coefficient of friction, Emser's counsel at the hearing admitted that the actual tile sent to Poipu was never tested for its coefficient of friction.  There is also no evidence that either party took any action after La Sonya Allen slipped and fell outside of Building 7 and before Bennett slipped and fell at Building 5 fifteen months later, other than the Owners placing some warning signs and cones as testified by the Bennetts in their depositions.  See Emser Ex. CC (Deposition of Beverly Bennett) at 49:11-18; Emser Ex. DD (Deposition of Michael Bennett) at 67:8-13.

Because there are material issues of fact, the Court DENIES Emser's Motion for Partial Summary Judgment with regard to the failure to warn claim.

## IV.   Negligent Misrepresentation (Count IV)

Finally, the Court turns to the Owners' negligent misrepresentation claim.  The Owners contend that Emser negligently misrepresented "that the subject flooring tile was safe and fit for its intended purposes, and that the flooring had specific coefficient of friction specifications when dry and/or wet."  FAC ¶ 20.  The Court first addresses the application of the economic loss rule, and then goes on to GRANT

summary judgment only insofar as the Owners assert a claim based on the value of damage to the product, that is, damage to the tile itself, but otherwise DENIES the motion on the negligent misrepresentation claim.

### a. Application of the Economic Loss Rule

A claim involving negligence often involves facts that are to be determined by a jury.  Here, Emser asserts that it is entitled to partial summary judgment because the Owners' direct claim for negligent misrepresentation is barred by the economic loss rule.  Reply at 7-8.

Under Hawaii law, the so-called "economic loss rule" applies to bar recovery in product liability cases for pure economic loss in actions stemming from injury only to the product itself.  State by Bronster v. U.S. Steel Corp., 82 Haw. 32, 41, 919 P.2d 294, 303 (1996); see Haw. Rev. Stat. § 663-1.2; SCD RMA, LLC v. Farsighted Enterprises, Inc., 591 F. Supp. 2d 1141, 1148 (D. Haw. 2008).  The economic loss rule thus absolves manufacturers in commercial relationships from a duty "under either a negligence or strict products-liability theory to prevent a product from injuring itself."  E. River S.S. Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 871, 106 S. Ct. 2295, 2302, 90 L. Ed. 2d 865 (1986).  Such a rule "marks the fundamental boundary between the law of contracts, which is designed to enforce expectations created by agreement, and the

law of torts, which is designed to protect citizens and their property by imposing a duty of reasonable care on others." City Express, Inc. v. Express Partners, 87 Haw. 466, 469, 959 P.2d 836, 839 (1998) (citations omitted).  Damage to a product itself is most appropriately a warranty claim.  Keahole Point Fish LLC v. Skretting Canada Inc., 971 F. Supp. 2d 1017, 1028 (D. Haw. 2013); U.S. Steel Corp., 919 P.2d at 302 ("Such damage means simply that the product has not met the customer's expectations, or, in other words, that the customer has received 'insufficient product value.'") (citation omitted).

The Hawaii Supreme Court has recognized exceptions to the economic loss rule and found that it does not apply when a defective product causes personal injury or damage to "other property." Ass'n of Apartment Owners of Newtown Meadows ex rel. its Bd. Of Directors v. Venture 15, Inc., 115 Haw. 232, 285, 167 P.3d 225, 278 (2007); Kawamata Farms, Inc. v. United Agric. Prods., 86 Haw. 214, 254, 948 P.2d 1055, 1095 (1997).  A court analyzing the applicability of the economic loss rule must therefore analyze the object of the bargain between the parties in order to determine what constitutes "the product" and what constitutes "other property." Windward Aviation, Inc. v. Rolls-Royce Corp., Civ No. 10-00542 ACK-BMK, 2011 WL 2670180, at *6 (D. Haw. July 6, 2011).

Here, Emser has not established that the rule barring tort claims for purely economic losses applies as to most of their claims.  On the other hand, the Owners are somewhat unclear as to what damages they are seeking from the negligent misrepresentation claim.  At the very least, it is clear that the Owners' negligent misrepresentation claim is predicated on the original personal injury claims asserted by Bennett, and Bennett's claims are not exclusively for economic loss.  See Wada v. Aloha King, LLC, 154 F. Supp. 3d 981, 1004 (D. Haw. 2015).  The Owners do not appear to seek to recover from any "other property," that is, property other than the Bombay tiles. The recovery sought by the Owners further stems from a claim that Emser did not exercise reasonable care in communicating information regarding its own materials.  See U.S. Steel Corp., 919 P.2d at 303.  In citing to Shaffer v. Earl Thacker Co., 6 Haw. App. 188, 716 P.2d 163 (1986), the Hawaii Supreme Court stated:

> The duty imposed by section 552 is therefore to exercise reasonable care or competence in obtaining or communicating information for the guidance of others in their business transactions.  This duty, however, is distinct from the duty eliminated by the economic loss rule.  As noted by the court in East River, the economic loss rule absolves manufacturers in commercial relationships from a duty "under either a negligence or strict products-liability theory to prevent a product from injuring itself."  476 U.S. at 871, 106 S. Ct. at 2302.  Utilization of the economic loss rule to dismiss a claim for negligent misrepresentation, therefore, would be incongruous.

U.S. Steel Corp., 919 P.2d at 303.

Therefore, to the extent the Owners may be asserting a claim based on the value of damage to the product, that is, damage to the tile itself, the Court GRANTS Emser's Motion for Partial Summary Judgment because such a claim is barred by the economic loss rule.  The Court next addresses any claims for damages under negligent misrepresentation not barred by the economic loss rule.

### b. Negligent Misrepresentation Analysis

Negligent misrepresentation requires:  "(1) false information be supplied as a result of the failure to exercise reasonable care or competence in communicating the information; (2) the person for whose benefit the information is supplied suffered the loss; and (3) the recipient relies upon the misrepresentation." Santiago v. Tanaka, 137 Haw. 137, 153-154, 366 P.3d 612, 628-629 (Haw. 2016) (citing Restatement (Second) of Torts § 552).  Plaintiffs may recover the pecuniary losses caused by their justifiable reliance on a negligent misrepresentation.  Honolulu Disposal Serv., Inc. v. American Ben. Plan Adm'rs, Inc., 433 F. Supp. 2d 1181, 1186 (D. Haw. 2006) ("Although the 'justifiable reliance' requirement appears to incorporate an ordinary reasonableness standard . . . it also requires the finder of fact to examine the circumstances

34

involved in the particular case, rather than judging the parties' actions against a purely objective standard."). Each element is addressed in turn.[3/]

First, Emser asserts that it exercised sufficient care in communicating the information regarding the subject tile. It argues that it had reasonable ground for believing the product information was true. As discussed above, Emser initially provided to the Owners a cut sheet from Emser's catalog, stating that the coefficient of friction was equal to or greater than 0.60 wet. See Emser Ex. C. Emser then provided the Bombay Master Certificate and the Revised Bombay Master Certificate, which both stated a 0.55 wet coefficient of friction and were both reviewed by the architect.

In providing both numbers, Emser depended on laboratory test results. Makovski Decl. ¶¶ 6, 7, 16. But Emser is unable to identify which precise laboratory generated the 0.6 coefficient of friction, which confusingly applied to both wet and dry, the meaning of which Emser's counsel could not explain. On the other hand, the cut sheet warned that "[c]eramic tile floors, like other types of glazed floors, can become slippery when wet. Take extra care when selecting a floor product that will be exposed to conditions such as liquids, grease, or oil."

---

[3/] Because the analysis of the two tort claims-failure to warn and negligent misrepresentation-is similar, any facts stated in one is incorporated by the other.

Emser Ex. C.  The cut sheet also displayed a figure of a person slipping.  See id.

Because only three of the Bombay tiles were tested as an average, some tiles had a higher coefficient of friction of 0.6 and some lower.  See Emser Ex. 2.  Emser's counsel asserted the architect, as a professional, should have been aware of the significance of such a practice.  But as discussed above, notwithstanding Emser's representations as to the tile coefficient of friction, the coefficient of friction of the tile sent to Poipu was never tested before shipment.  When the Bombay tiles used at Poipu were tested in 2020 and 2021, the tests revealed a coefficient of friction of an average of 0.48 and under 0.49, respectively.  See Def. CSF ¶ 27.

The Owners further point out in their Opposition that Emser received the updated testing information in 2011 showing a coefficient of friction of less than 0.6, but Emser nevertheless provided a cut sheet in September 2012 to Poipu stating a 0.6 coefficient of friction.  Opp. at 9; Def. CSF ¶ 29.

Second, the Court turns to the next element of negligent misrepresentation and finds that clearly the Owners were the person for whose benefit the information was supplied and that it suffered the loss of receiving tile that included tile with a lower coefficient of friction than the standard of

36

0.6 and are now facing lawsuits from guests injured by slipping on the tile as well as major corrective work.

Finally, Emser argues that the Owners cannot establish justifiable reliance.  Mot. at 21.  The question of whether a plaintiff's reliance was justifiable is ordinarily a question for the jury, but it may be decided at the summary judgment stage if the facts support only one conclusion.  See Honolulu Disposal, 433 F. Supp. 2d at 1186.

The Court again notes that while the "justifiable reliance" requirement incorporates an ordinary reasonableness standard, it also requires the finder of fact to examine the circumstances involved in the particular case, rather than judging the parties' actions against a purely objective standard.  Id. at 1191.

The Court finds that it is questionable whether the Owners were aware that Emser's standard practice was to establish a coefficient of friction by testing only three tiles and taking the average thereof, with the result that Emser's representation of the 0.6 coefficient of friction would include some tiles with a coefficient of friction of 0.6 or higher, and some tiles less than a 0.6 coefficient of friction.

The Owners claim they relied on the cut sheet coefficient of friction because "the tile would not have even

been submitted to the AOAO board for consideration if the wet coefficient of friction was under .6."  Opp. at 11.

As discussed <u>supra</u>, Emser supplied both the cut sheet and the Revised Master Certificate by October 17, 2012.  Mot. at 22; Emser Ex. C.  The general contractor Layton did not order the tiles that were installed at Building 5, where Bennett fell, until September 2014.  Mot. at 22.  But the Owners had ordered tile for Building 4 before receiving the certificates.  <u>See</u> Johnson Decl. ¶¶ 29, 30.  Emser argues that the Owners could have discovered the 0.55 number by looking at its own set of documents, although those documents had been received after the Owners had already ordered some tile at the beginning of the Project (for Building 4).  <u>See</u> <u>Honolulu Disposal</u>, 433 F. Supp. 2d at 1193 (finding no reasonable reliance because the plaintiff always had control over the records at issue); <u>Balkind v. Telluride Mountain Tile Co.</u>, 8 P.3d 581, 587 (Colo. App. 2000) ("If the plaintiff has access to information that was equally available to both parties and would have led to discovery of the true facts, the plaintiff has no right to rely upon the misrepresentation.").  On the other hand, Emser could have avoided its own misrepresentations if it had reviewed its own records.

The Owners argue that the architect's stamp on both the Bombay Master Certificate as well as the Revised Bombay

38

Master Certificate does not constitute an approval of the information contained in the certificates.  Opp. at 13.  But the architect's stamp suggests to the Court that at the very least he reviewed the information contained within the certificates.

In sum, the Court finds there are material issues of fact regarding the Owners' negligent misrepresentation claim and therefore the Court DENIES Emser's Motion for Partial Summary Judgment on the negligent misrepresentation claim.

## CONCLUSION

For the foregoing reasons, the Court GRANTS IN PART AND DENIES IN PART Emser's Motion for Partial Summary Judgment, ECF No. 95, as follows:

1. Emser's Motion for Partial Summary Judgment with regard to the Owners' breach of express and implied warranties is GRANTED.

2. Emser's Motion for Partial Summary Judgment of the Owners' failure to warn claim is DENIED.

3. To the extent that the Owners assert a claim under negligent misrepresentation based on the value of damage to the product, that is, to the tile itself, Emser's Motion for Partial Summary Judgment is GRANTED.  As to any other claim under the negligent misrepresentation

claim, Emser's Motion for Partial Summary Judgment is

DENIED.


     IT IS SO ORDERED.

     DATED: Honolulu, Hawai`i, September 7, 2021.


_____
Alan C. Kay
Sr. United States District Judge


Bennett v. Poipu Resort Partners, et al., Civ. No. 18-00171 ACK-KJM, Order Granting in Part and Denying in Part Third-Party Defendant and Counterclaimant Emser Tile, LLC's Motion for Partial Summary Judgment (ECF No. 95).